FILED
5/20/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

KSR

Judge Sunil R. Harjani
Magistrate Judge Maria Valdez
RANDOM/CAT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) No. 25CR255 |
| SYED MURTUZA KABLAZADA and SYED MEHDI HUSSAIN | ) Violation: Title 18, United States Code, Section 1347 |

**COUNTS ONE THROUGH FOUR**

The SPECIAL MAY 2024 GRAND JURY charges:

1. At times material to this Indictment:

**The Medicare Program**

a. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age or older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries," and were assigned an identification number ("Medicare Beneficiary Identifier").

b. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

c. Physicians, clinics, laboratories, and other health care providers that provided services to Medicare beneficiaries were able to apply for and obtain a

1

"provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare for services provided to beneficiaries.

   d. To receive Medicare reimbursement, health care providers had to fill out an application and execute a written provider agreement, known as CMS Form 855. The application contained certifications that the provider agreed to abide by Medicare laws and regulations, and that the provider "[would] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and [would] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Medicare providers were given access to Medicare manuals and service bulletins describing procedures, rules, and regulations.

   e. To receive reimbursement for specific services from Medicare, a provider had to submit a claim with certain information, including information regarding the beneficiary; the type of services provided (typically identified by a procedure code); the billed amount for the services provided; and a certification that the services for which payment were sought were rendered by the listed provider.

### Over-the-Counter COVID-19 Test Kits

   f. In or around April 2022, the federal government announced that Medicare beneficiaries could receive up to eight over-the-counter COVID-19 test kits per calendar month from participating pharmacies and health care providers, for the duration of the COVID-19 public health emergency, at no cost to Medicare beneficiaries. This program was intended to ensure Medicare beneficiaries had access

2

to over-the-counter COVID-19 test kits they needed to stay safe and healthy during the COVID-19 pandemic.

g. Medicare would not pay for more than eight over-the-counter COVID-19 test kits per calendar month, per Medicare beneficiary. CMS issued guidance instructing providers to distribute over-the-counter COVID-19 test kits only to Medicare beneficiaries who requested them. Providers also were instructed to keep documentation showing a Medicare beneficiary's request for the test kits.

h. The public health emergency for COVID-19 ended on May 11, 2023, at which point Medicare would no longer pay for eight over-the-counter COVID-19 test kits per month at no cost to beneficiaries. However, on February 9, 2023, Medicare announced that it would allow a one-year grace period for providers to bill over-the-counter COVID-19 test kits that were provided to beneficiaries prior to May 11, 2023, but that the provider was unable to bill prior to the May 11, 2023, deadline.

i. In order to receive reimbursement from Medicare for supplying over-the-counter COVID-19 test kits, providers were directed to bill Medicare using Healthcare Common Procedure Code System ("HCPCS") code K1034.

### The Defendants and Related Companies

j. Chicago Care Lab Services, LLC ("Chicago Care") was an Illinois company purportedly located in Chicago, Illinois. Chicago Care was enrolled as a provider with Medicare and purported to provide over-the-counter COVID-19 test kits to Medicare beneficiaries. Chicago Care received reimbursements from Medicare into a Financial Institution 1 account ending in x9668.

3

      k.    V Care Testing Centre Corp. ("V Care") was an Illinois company purportedly located in Chicago, Illinois. V Care was enrolled as a provider with Medicare and purported to provide over-the-counter COVID-19 test kits to Medicare beneficiaries. V Care received reimbursements from Medicare into a Financial Institution 2 account ending in x0975.

      l.    Al-Ameer Testing Center Inc. ("Al-Ameer") was an Illinois company purportedly located in Carol Stream, Illinois. Al-Ameer was enrolled as a provider with Medicare and purported to provide over-the-counter COVID-19 test kits to Medicare beneficiaries. Al-Ameer received reimbursements from Medicare into a Financial Institution 3 account ending in x9668.

      m.    Marketing Company 1 was a purported telemarketing company based in Pakistan.

    2.    From in or around January 2023, and continuing through in or around June 2023, in the Northern District of Illinois, Eastern Division, and elsewhere,

SYED MURTUZA KABLAZADA and<br>
SYED MEHDI HUSSAIN,

defendants herein, and others known and unknown to the Grand Jury, participated in a scheme and artifice to defraud a health care benefit program, namely Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services, which scheme is further described below.

3. It was part of the scheme that KABLAZADA, HUSSAIN, and others unlawfully enriched themselves by: (a) purchasing laboratories, including Chicago Care, V Care, and Al-Ameer, and installing nominee owners at the laboratories; (b) submitting and causing the submission of false and fraudulent claims from the laboratories to Medicare for items and services that were not provided as represented; (c) concealing the submission of false and fraudulent claims and the receipt and transfer of the proceeds from the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of themselves and others, and to continue the fraud.

4. It was further part of the scheme that KABLAZADA and HUSSAIN purchased laboratories, including Chicago Care, V Care, and Al-Ameer, and installed foreign nationals to act as nominee owners at the laboratories, in order to submit fraudulent claims to Medicare for the provision of over-the-counter COVID-19 test kits, with the understanding the nominee owners would flee the United States upon learning that their laboratory was under investigation.

5. It was further part of the scheme that KABLAZADA and HUSSAIN submitted and caused the submission of false and fraudulent claims to Medicare for over-the-counter COVID-19 test kits purportedly provided by Chicago Care, V Care, and Al-Ameer that were not in fact provided to Medicare beneficiaries as represented to Medicare.

6. It was further part of the scheme that KABLAZADA and HUSSAIN submitted and caused the submission of false and fraudulent claims to Medicare for

over-the-counter COVID-19 test kits purportedly provided by Chicago Care, V Care, and Al-Ameer that Medicare beneficiaries had not requested.

7. It was further part of the scheme that KABLAZADA and HUSSAIN submitted and caused the submission of false and fraudulent claims to Medicare for over-the-counter COVID-19 test kits purportedly provided by Chicago Care, V Care, and Al-Ameer to Medicare beneficiaries who had died prior to the purported date of service for the claim.

8. It was further part of the scheme that KABLAZADA and HUSSAIN caused Chicago Care, V Care, and Al-Ameer to make payments to Marketing Company 1 in exchange for Medicare Beneficiary Identifiers for hundreds of thousands of Medicare beneficiaries, which Chicago Care, V Care, and Al-Ameer used to submit fraudulent claims to Medicare for over-the-counter COVID-19 test kits.

9. It was further part of the scheme that KABLAZADA, HUSSAIN, and others submitted and caused the submission of approximately $227 million in false and fraudulent claims to Medicare, of which Medicare paid approximately $136 million to Chicago Care, V Care, Al-Ameer and other laboratories for over-the-counter COVID-19 test kits that were not requested by Medicare beneficiaries and were not provided as represented.

10. It was further part of the scheme that, in order to use or retain the fraudulently obtained funds, KABLAZADA, HUSSAIN, and others caused funds paid by Medicare to the laboratories to be transferred quickly from the laboratory bank accounts to other accounts.

11. It was further part of the scheme that KABLAZADA, HUSSAIN, and others misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the acts done in furtherance of the scheme and the purposes of those acts.

12. On or about the submission dates below, in the Northern District of Illinois, Eastern Division, and elsewhere, KABLAZADA and HUSSAIN, defendants herein, did knowingly and willfully execute, and attempt to execute, the above-described scheme by submitting and causing to be submitted claims to a health care benefit program, namely Medicare, for over-the-counter COVID-19 test kits that were not actually provided and/or requested, each such submission constituting a separate count:

| Count | Purported Patient | Approx. Submission Date | Billing Entity | Approx. Date of Service | Approx. Amt. Billed | Approx. Amt. Paid |
|---|---|---|---|---|---|---|
| 1 | S.D. | 5/1/2023 | Al-Ameer | 3/23/2023 | $120.00 | $94.08 |
| 2 | L.P. | 5/8/2023 | Al-Ameer | 9/1/2022 | $120.00 | $94.08 |
| 3 | S.D. | 5/11/2023 | Chicago Care | 7/5/2022 | $120.00 | $94.08 |
| 4 | L.P. | 5/12/2023 | V Care | 7/4/2022 | $120.00 | $94.08 |

Each in violation of Title 18, United States Code, Section 1347.

**FORFEITURE ALLEGATION**

The SPECIAL MAY 2024 GRAND JURY further alleges:

1. Upon conviction of an offense in violation of Title 18, United States Code, Section 1347, as set forth in this Indictment,

SYED MURTUZA KABLAZADA and
SYED MEHDI HUSSAIN,

defendants herein, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

2. The property to be forfeited includes, but is not limited to the following:

   a. Approximately $27,414,554.61 in funds seized on or about June 21, 2023, from Financial Institution 1 account number xxxxxxxx9668;

   b. Approximately $553,732.58 in funds seized on or about April 30, 2025, from Financial Institution 1 account number xxxxxxxx9668;

   c. Approximately $8,837,267.28 in funds seized on or about June 23, 2023, from Financial Institution 2 account number xxxxxxxx0975;

   d. Approximately $2,550,587.58 in funds seized on or about June 23, 2023, from Financial Institution 2 account number xxxxxxxx4595;

   e. Approximately $251,361.95 in funds seized on or about September 21, 2023, from Financial Institution 4 account number xxxxxxxx3659;

   f. Approximately $785,203.00 in funds seized on or about September 21, 2023, from Financial Institution 4 account number xxxxxxxx3675;

8

g. Approximately $291,480.68 in funds seized on or about June 21, 2023, from Financial Institution 3 account number xxxxxxx3095;

h. Approximately $182,227.90 in funds seized on or about June 21, 2023, from Financial Institution 3 account number xxxxxxx3417;

i. Approximately $571,500.60 in funds seized on or about June 21, 2023, from Financial Institution 2 account number xxxxxxx5304;

j. Approximately $2,557,943.51 in funds seized on or about June 21, 2023, from Financial Institution 1 account number xxxxxxx1880;

k. Approximately $499,080.08 in funds seized on or about September 21, 2023, from Financial Institution 2 account number xxxxxxx5452;

l. Approximately $82,085.28 in funds seized on or about June 23, 2023, from Financial Institution 1 account number xxxxxxx8671;

m. Approximately $243,859.89 in funds seized on or about June 23, 2023, from Financial Institution 3 account number xxxxxxx7593;

n. Approximately $82,192.72 in funds seized on or about June 23, 2023, from Financial Institution 1 account number xxxxxxx2382;

o. Approximately $64,140.00 in funds seized on or about June 23, 2023, from Financial Institution 1 account number xxxxxxx5863;

p. Approximately $109,763.00 in funds seized on or about June 23, 2023, from Financial Institution 1 account number xxxxxxx7126;

q. Approximately $370,712.50 in funds seized on or about June 23, 2023, from Financial Institution 1 account number xxxxxxx3338;

r. Approximately $150,000.00 in funds seized on or about June 23, 2023, from Financial Institution 1 account number xxxxxxxx5859;

s. Approximately $53,675.89 in funds seized on or about June 23, 2023, from Financial Institution 1 account number xxxxxxxx1623;

t. Approximately $4,240.52 in funds seized on or about June 23, 2023, form Financial Institution 1 account number xxxxxxxx7792;

u. Approximately $150,000.00 in funds seized on or about June 23, 2023, from Financial Institution 1 account number xxxxxxxx9518;

v. One 2023 Cadillac Escalade ESV bearing VIN # 1GYS4SK91PR215553; and

w. One 2023 Cadillac Escalade ESV bearing VIN #1GYS4SK99PR173388.

3. If any of the property described above, as a result of any act or omission of the defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be subdivided without difficulty; the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).

A TRUE BILL:

_____
FOREPERSON

10

_____
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION
ACTING CHIEF

11